**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 18 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DEMARQUES M. MORRIS,

      Defendant - Appellant.

No. 00-3076

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 99-CR-10086-003)

Michael D. Hepperly (Cynthia F. Grimes, Grimes & Rebein, L.C., Lenexa,
Kansas, with him on the briefs), Wichita, Kansas, for the Defendant-Appellant.

D. Blair Watson, Assistant United States Attorney, (Jackie N. Williams, United
States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

Before **BRORBY**, **McKAY** and **LUCERO**, Circuit Judges.

**LUCERO**, Circuit Judge.

      DeMarques Morris was found guilty by a jury on two Hobbs Act counts, 18

U.S.C. § 1951, and five counts of using, brandishing, or discharging a firearm

during a crime of violence, 18 U.S.C. § 924(c). On March 6, 2000, he was sentenced to 490 months imprisonment. This matter is before us on direct appeal of Morris's convictions. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

**I**

In the Spring of 1999, two Wichita grocery stores were robbed at gunpoint. During one of these robberies, a customer was injured by the discharge of a robber's gun.

Approximately a month after the second robbery, on June 30, 1999, Sh-Pone Harris and Elliot Toles were arrested following a robbery of a Burger King, also in Wichita. They were taken to the FBI's Violent Crimes Task Force at approximately 5:30 p.m. During interrogation, Harris implicated a third suspect in the Burger King and grocery store robberies. He gave investigators information as to where they might find the third suspect, and the investigators set up surveillance at two spots at about 8:30 p.m. At 11:30 p.m., Morris, a.k.a. "Kidnap," was arrested as he was coming out of a convenience store.

Morris was taken to the office of the FBI Violent Crimes Task Force and handcuffed to a table. At approximately 12:30 a.m. on July 1, a personal history on Morris was completed. Three hours later, agents Nevil and Pritchett returned to Morris and played portions of the recorded statements given to them by Toles

and Harris.  Thereafter, at 3:20 a.m., Morris signed a waiver of rights and gave an incriminating statement.

## II

### A.  Double Jeopardy

Based on the two robberies, Morris was convicted of two Hobbs Act violations for interfereing with commerce by robbery and of five § 924(c) violations for either using, brandishing, or discharging a firearm during a crime of violence. [1]  Morris asserts his convictions violate the Double Jeopardy Clause because the five § 924(c) counts are multiplicitous [2]—that is, they are based on the same behavior—and because the § 924(c) counts constitute the same offenses as

---

[1]  Morris was convicted on count 1, a Hobbs Act charge for an April 1999 robbery.  On the basis of the April 1999 robbery, Morris was charged and convicted on count 2 (use of a firearm in violation of 18 U.S.C. § 924(c)(1)(A)), count 3 (brandishing a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(ii)), and count 4 (discharging a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(iii)).  Morris also was convicted on count 6, a Hobbs Act charge for a May 1999 robbery.  On the basis of that robbery, he was charged and convicted for two additional § 924(c) violations: count 7 (use of a firearm in violation of 18 U.S.C. § 924(c)(1)(A)) and count 8 (brandishing a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(ii)).  Morris was sentenced to two concurrent seventy-month terms on the Hobbs Act convictions, which were to run consecutively to concurrent terms of ten, seven, and five years on the first three § 924(c) violations which, in turn, were to run consecutively to concurrent terms of twenty-five years on the two remaining § 924(c) violations.  The total sentence was 490 months.

[2]  Morris does not explicitly state his multiplicity claim as arising under the Double Jeopardy Clause of the Constitution, but our jurisprudence establishes that multiplicitous sentences violate the Double Jeopardy Clause.  See, e.g., United States v. Chalan, 812 F.2d 1302, 1315–17 (10th Cir. 1987).

the Hobbs Act counts.  We review his double jeopardy claims de novo.     See United States v. Pearson   , 203 F.3d 1243, 1267 (10th Cir. 2000);     United States v. McIntosh , 124 F.3d 1330, 1336 (10th Cir. 1997).

The Double Jeopardy Clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  This protection applies not only to successive prosecutions, but also to successive punishments for the same offense.     United States v. Dixon   , 509 U.S. 688, 696 (1993).  This Court has held that a "person may be prosecuted for more than one crime based on the same conduct (1) if each crime requires proof of a fact that the other does not or (2) if Congress has clearly expressed its intent to impose cumulative punishment for the same conduct under different statutory provisions."   Pearson , 203 F.3d at 1267–68 (citing    Blockburger v. United States   , 284 U.S. 299, 304 (1932), and    Garrett v. United States   , 471 U.S. 773, 778 (1985)); see also  United States v. Overstreet   , 40 F.3d 1090, 1094–95 (10th Cir. 1994) (holding that the Double Jeopardy Clause is not violated if Congress intended to impose cumulative punishment through two different statutes prohibiting the same conduct; thus, convictions for carjacking and § 924(c) counts did not violate the Double Jeopardy Clause).

1.  Multiple § 924(c) Convictions

Multiplicitous counts are "improper because they allow multiple punishments for a single criminal offense." McIntosh, 124 F.3d at 1336. "We have held that consecutive sentences may be imposed for multiple 924(c) counts if the offenses underlying each 924(c) count do not constitute a single offense for double jeopardy purposes." United States v. Sturmoski, 971 F.2d 452, 461 (10th Cir. 1992) (citing United States v. Chalan, 812 F.2d 1302, 1315–17 (10th Cir. 1987)). We have also concluded that concurrent sentences for multiple § 924(c) violations cannot be imposed where consecutive sentences are prohibited by double jeopardy. See United States v. Moore, 958 F.2d 310, 313–14 & n.5 (10th Cir. 1992).

Our multiplicity analysis focuses on the number of offenses underlying the punishments imposed. United States v. Callwood, 66 F.3d 1110, 1114 & n.4 (10th Cir. 1995); see also Chalan, 812 F.2d at 1317 (holding that because defendant only committed a single crime of violence for double jeopardy purposes, two § 924(c) convictions could not be sustained). Accordingly, we have held that a single predicate offense cannot sustain multiple § 924(c) violations simply because a defendant employed multiple firearms. See, e.g., United States v. Rogers, 921 F.2d 1089, 1092–93 (10th Cir. 1990); United States v. Henning, 906 F.2d 1392, 1399 (10th Cir. 1990).

In the instant case, Morris was convicted of two Hobbs Act violations, each of which may serve as a predicate offense for a § 924(c) violation.[3] As dictated by our precedent, the commission of two Hobbs Act violations can support convictions on only two § 924(c) violations. Accordingly, we conclude that Morris's rights under the Double Jeopardy Clause were violated when the district court entered five judgments of conviction on § 924(c) counts on the basis of only two predicate offenses.

Appellee argues that the district court's entry of judgment on additional § 924(c) convictions was harmless to defendant because the sentences run concurrently to those on the properly entered judgments of conviction. Our

---

[3] 18 U.S.C. § 924(c) reads as follows:

> (c)(1)(A) [A]ny person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . .
> (i) be sentenced to a term of imprisonment of not less than 5 years;
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.
> . . .
> (C) In the case of a second or subsequent conviction under this subsection, the person shall-
> (i) be sentenced to a term of imprisonment of not less than 25 years . . . .

precedent, however, expressly forecloses this argument.   See Moore, 958 F.2d at

313–14 & n.5.   There are "potential adverse collateral consequences [arising from

separate convictions] that may not be ignored."   Ball v. United States, 470 U.S.

856, 865 (1985);   see also Moore, 958 F.2d at 313 (quoting same).

> For example, the presence of two convictions on the record may
> delay the defendant's eligibility for parole or result in an increased
> sentence under a recidivist statute for a future offense.  Moreover,
> the second conviction may be used to impeach the defendant's
> credibility and certainly carries the societal stigma accompanying any
> criminal conviction. . . .  Thus, the second conviction, even if it
> results in no greater sentence, is an impermissible punishment.

Ball, 470 U.S. at 865 (internal citations omitted).

Accordingly, we vacate the district court's judgment and sentence on the

five § 924(c) convictions and remand for entry of judgment on only one § 924(c)

conviction per Hobbs Act conviction—a maximum of two § 924(c)

convictions—and for appropriate resentencing on the constitutionally sustainable

number of convictions.

2.  Hobbs Act and § 924(c)

Morris's second double jeopardy argument is that the § 924(c) violations

constitute the same offenses as the Hobbs Act robberies and thus his convictions

on the § 924(c) counts violate his constitutional rights.  He asserts that the

elements of a § 924(c) violation and a § 1951 violation are exactly the same.

Morris's argument must fail because it has already been decided by this Court in Pearson, 203 F.3d at 1243, and this panel can not overrule established Tenth Circuit precedent, see, e.g., In re Smith, 10 F.3d 723, 724 (10th Cir. 1993) ("We cannot overrule the judgment of another panel of this court. We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court."). In Pearson, we concluded that Congress clearly intended to "provide multiple punishments to defendants who commit violent crimes while using or carrying a firearm." 203 F.3d at 1268. We therefore rejected the defendant's contention that his convictions under § 1951 and § 924(c) violated the Double Jeopardy Clause because they were based on the same conduct. Id. In Pearson, we also explicitly considered and rejected Morris's argument that the Congressional intent test is inconsistent with Dixon, 509 U.S. at 696, which applies the same-elements test to both prosecutions and punishments. See Pearson, 203 F.3d at 1268 ("We are not persuaded by [the] argument that United States v. Dixon . . . overruled Garrett and Hunter and established Blockberger's same elements tests as the sole test for whether multiple punishments violate the Double Jeopardy Clause.").

### B. Constitutionality of the Hobbs Act

Morris challenges the constitutionality of the Hobbs Act arguing its application to him is an unconstitutional exercise of Congress's power to regulate

under the Commerce Clause.  He asserts that this Court should reverse his convictions and overrule its prior Hobbs Act jurisprudence in light of the Supreme Court's decision in United States v. Lopez, 514 U.S. 549 (1995), as it applies to "isolated robberies not committed as part of racketeering acts" (Appellant's Br. at 7) or that this Court should "remand for a new trial" so that the jury can be instructed it must find the activity "substantially impacted" interstate commerce (id. at 16).  Morris's argument relies on the proposition that to be constitutionally applied to non-racketeering robberies, the Hobbs Act requires a demonstration that a defendant's conduct more than minimally impacted interstate commerce.  We review this challenge to the constitutionality of the Hobbs Act de novo.  Pearson, 203 F.3d at 1267.

In United States v. Bolton, 68 F.3d 396 (10th Cir. 1995), we examined our prior Hobbs Act jurisprudence in light of the Supreme Court's decision in Lopez.  We concluded that

> Lopez did not . . . require the government to show that individual instances of the regulated activity substantially affect commerce to pass constitutional muster under the Commerce Clause.  Rather, the Court recognized that if a statute regulates an activity which, through repetition, in aggregate has a substantial affect [sic] on interstate commerce, "the de minimis character of individual instances arising under that statute is of no consequence."

Bolton, 68 F.3d at 399 (quoting Lopez, 514 U.S. at 558) (further citation omitted).  We then concluded that the "Hobbs Act regulates activities which in aggregate

have a substantial effect on interstate commerce," the statute "represents a permissible exercise of the authority granted to Congress under the Commerce Clause, and . . . under Lopez, all the government need show is a de minimis effect on interstate commerce in order to support a conviction under the Act." Bolton, 68 F.3d at 399. Citing the government's production of evidence at trial establishing that defendant's robberies affected interstate commerce, we upheld defendant's Hobbs Act conviction. Id. at 399–400.

We have also upheld the Hobbs Act in light of the Supreme Court's more recent Commerce Clause cases, United States v. Morrison, 529 U.S. 598 (2000), and Jones v. United States, 529 U.S. 848 (2000). See United States v. Malone, 222 F.3d 1286 (10th Cir. 2000). In Malone, we again held that "only a de minimis showing [of effect on interstate commerce] is required under the Hobbs Act." Id. at 1294. Central to our determination was that the Hobbs Act, unlike the Gun-Free School Zones Act at issue in Lopez and the Violence Against Women Act at issue in Morrison, regulates economic activity and "contains an explicit and expansive jurisdictional element establishing that it is in pursuance of Congress' power to regulate interstate commerce." Malone, 222 F.3d at 1295. In examining the Hobbs Act in light of Jones, we again focused on the jurisdictional element of the Act. Malone, 222 F.3d at 1295. Citing Jones, 529 U.S. at 854, for the proposition that "when Congress uses the words 'affecting commerce'

- 11 -

without qualification, it intends to invoke its full authority under the Commerce Clause," we concluded that the Hobbs Act "does not suggest that Congress intended to limit its jurisdiction in any way." Malone, 222 F.3d at 1295.

Petitioner argues that the Hobbs Act is meant to regulate racketeering and not "garden variety" robberies. (Appellant's Br. at 11–14.) From there, he argues "garden variety" robberies, such as the ones he participated in, do not "bear[] a substantial relation to commerce, [such that] the de minimis character of individual instances arising under that statute is of no consequence." Lopez, 514 U.S. at 548. He asserts that even if we conclude the Act is intended to regulate "garden variety" robberies, the "United States would need to prove beyond a reasonable doubt that the individual robberies in these case[s] substantially impacted interstate commerce." (Appellant's Br. at 15.)

As an initial matter, we conclude that the plain language of the Hobbs Act does not limit its scope to "racketeering" robberies. Contrary to petitioner's argument, there is nothing in the statute to indicate that the "plan or purpose" language limits its scope. In fact, the "plan or purpose" language only requires the accused individual to have a "plan or purpose to do anything in violation of [the Act]." 18 U.S.C. § 1951(a). One way to violate the Act is to commit a robbery that affects commerce "in any way or degree." Id. Under the Act, robbery "means the unlawful taking or obtaining of personal property from the

person . . . against his will, by means of actual or threatened force, or violence . . . ." Id. § 1951(b)(1). Nothing in the definition of robbery requires a series of so-called racketeering robberies. Because the statute is clear on its face, we decline to examine the alleged lack of legislative intent to regulate criminal activity already punished by the States.

Second, Morris defeats his own argument by relying on the "constitutional pitfall enunciated in Lopez"—that is, the lack of a jurisdictional element to ensure impact on interstate commerce—to support his contention that the government must show a substantial effect on interstate commerce. (Appellant's Br. at 15.) Once again, petitioner fails to read the plain language of the statute. There is no question that the Hobbs Act contains a jurisdictional element. 18 U.S.C. § 1951(a) ("Whoever in any way or degree . . . affects commerce . . . shall be fined under this title or imprisoned . . . ."). As discussed above, the reason we have repeatedly held that the government need only show a de minimis effect on interstate commerce to prove a Hobbs Act violation is because the Act has a jurisdictional element, which ensures that in each case a nexus between the conduct at issue and interstate commerce exists. As we concluded in Malone, the presence of the jurisdictional element in the Act demonstrates Congress's intent to exercise its full authority under the Commerce Clause. 222 F.3d at 1295.

Although Morris attempts to style his challenge to the Hobbs Act as an as-applied one, his challenge is really to Tenth Circuit jurisprudence holding that only a de minimis effect on interstate commerce must be demonstrated to convict a defendant of a Hobbs Act violation. Because this Circuit has addressed precisely these challenges since Lopez, Morrison and Jones, Morris's challenge must fail. This panel can not overrule established Tenth Circuit precedent. See, e.g., In re Smith, 10 F.3d at 724.

In sum, we reject Morris's contention that the Hobbs Act was unconstitutionally applied to him. Morris participated in an activity expressly regulated by the Act, i.e., robbery. We have held that the Hobbs Act regulates economic activity and that the jurisdictional element shows Congress's intent to exercise its full authority under the Commerce Clause. Malone, 222 F.3d at 1295. Finally, in Bolton we concluded that "Congress determined that robbery . . . [is an] activit[y] which through repetition may have substantial detrimental effects on interstate commerce." 68 F.3d at 399. Thus, under Lopez, the fact that any robbery may have had only a de minimis effect on interstate commerce does not render regulation of that activity an unconstitutional exercise of congressional power. See Lopez, 514 U.S. at 558. Here, the jury explicitly found that Morris's conduct affected interstate commerce; accordingly, the Hobbs Act was constitutionally applied to Morris.

### C. Fourth Amendment: Probable Cause

Before trial, the district court held a hearing on Morris's motion to quash his arrest for lack of probable cause. The court found probable cause for Morris's arrest, and Morris appeals that decision.

We review de novo the trial court's determination of the reasonableness of an arrest under the Fourth Amendment and we review for clear error the trial court's findings of fact. United States v. Allen, 235 F.3d 482, 488 (10th Cir. 2000). In assessing Morris's challenge rooted in his Fourth Amendment rights, we view the evidence in the light most favorable to the district court's findings. United States v. Foster, 100 F.3d 846, 849 (10th Cir. 1996). Additionally, "the credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." Id. (quoting United States v. Fernandez, 18 F.3d 874, 876 (10th Cir. 1994)).

A full custodial arrest conducted without a warrant, such as the arrest of Morris, requires probable cause. United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998). An officer has probable cause to arrest if, under the totality of the circumstances, he "learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." Id. (quoting United States v. Guerrero-Hernandez, 95 F.3d 983, 986 (10th Cir.

1996)).  Probable cause does not require facts sufficient for a finding of guilt; however, it does require "more than mere suspicion."  Id. (citing United States v. Hansen, 652 F.2d 1374, 1388 (10th Cir. 1981)).  "[T]he finding of probable cause to support an arrest may be based on a co-defendant's hearsay statement, in whole or part."  Vazquez-Pulido, 155 F.3d at 1216 n.5 (citing Clanton v. Cooper, 129 F.3d 1147, 1155 (10th Cir. 1997)).  When such a hearsay statement is corroborated, a finding of probable cause is enhanced.  Vazquez-Pulido, 155 F.3d at 1216 n.5 (citing Illinois v. Gates, 462 U.S. 213, 241 (1983)).

We have reviewed carefully the parties' arguments, the transcript of the motion to quash, and the trial court's decision.  Viewing the evidence in the light most favorable to the district court's conclusion, [4] we conclude there was probable cause for Morris's arrest.  The chain of events beginning with Morris's co-defendants' identification of a third participant in the robberies and concluding with Morris's arrest establishes that the police had much "more than [a] mere

---

[4] The evidence submitted after the motion to quash seems to establish the car Morris was driving at the time of his arrest was not registered to Toles, but rather to Bob Smith Autorama Center in Oklahoma and rented to Shawn Bradford in Wichita, Kansas.  This evidence tends to disprove the court's factual finding that Morris was apprehended while driving a "vehicle which belonged to Toles." (I R. Doc. 84 at 2.)  Accordingly, our conclusion on the issue of probable cause does not rest in any manner on this finding.  We note, however, that the trial court was not presented with proper evidence of ownership at the time of the hearing, and we reject the argument implied throughout Morris's brief that the court's erroneous conclusion on ownership of the vehicle calls into question the court's other factual findings and credibility determinations.

suspicion." <u>Vazquez-Pulido</u>, 155 F.3d at 1216. The trial court found Harris successfully aided the agents in forming a plan to capture Morris. Harris called Morris on a cell phone belonging to Morris. During the call, Harris asked Morris to come pick him up so that Harris could evade being caught for the robbery of a Burger King—in other words, Harris requested that Morris be an accessory after the fact to the Burger King robbery. In the meantime, agents were monitoring an apartment building Harris identified as Morris's place of residence. Shortly after the cell phone call was placed, Morris was seen leaving that building and was

subsequently arrested. [5] We hold that under the totality of the circumstances, there was probable cause for Morris's arrest.

## D. Fifth Amendment: Voluntariness of Confession

At the hearing on the motion to quash his arrest, Morris also argued a motion to suppress the incriminating statement he gave to agents at 3:00 a.m. The trial court denied his motion, finding Morris's testimony unbelievable and the agents' testimonies credible. Morris appeals the district court's denial of his motion to suppress, arguing his confession was not voluntary.

---

[5] Our conclusion does not rest on any consideration of the NCIC report on Morris concerning his alleged prior involvement in robberies in Oklahoma. Thus, we need not determine whether that report was generated before or after Morris's arrest and we need not grant what appears to be a motion to supplement the record in appellant's reply brief based on the NCIC controversy.

Related to the NCIC controversy is the question of whether Harris knew Morris's name before Harris was told it by the agents. We find disingenuous and misleading Morris's continued citation to Harris's conversation with Agent Pritchett before Morris's arrest. Morris quotes in his briefs the following:

> Pritchett: Do you know what his real name is?
> Harris: I just found out, Demarco, something like that, Demark, Marcus . . .
> Nevil: Demarcus Morris?
> Harris: Yeah. Demarcus. I knew Marcus, 'cuz of the other night.

(I R. Doc. 124 at 9.) The rest of Harris's statement, which Morris fails to quote, is: "He said something like, something about a situation where he had, just he mentioned his name. I was like, 'Wow! I never heard your name before ever.'" (Id.) In other words, Harris knew Morris's name from a conversation the two had several nights before their arrests.

- 18 -

We review the voluntariness of a confession de novo. United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997). This Court will not substitute its own judgment for that of the district court on "subsidiary factual questions, such as whether the police intimidated or threatened a suspect or whether a suspect was particularly susceptible to police coercion," unless those factual findings are clearly erroneous. Chalan, 812 F.2d at 1307–08.

Morris now asserts that during his first meeting with Agents Nevil and Pritchett in the FBI's Violent Crimes Task Force office he told them he wanted time to think about making a statement and he wanted a lawyer. It is undisputed that the agents then left without reading him his rights. The agents came back three hours later and told him that Toles and Harris were cooperating. They played tapes of Toles's and Harris's confessions. At the hearing, Morris testified that Agent Pritchett demonstrated the difference in prison time he would receive if he cooperated or refused to cooperate by pointing to pictures of past criminals on the wall. He claims Pritchett pointed to one past criminal and said because that criminal did not cooperate he was sentenced to seventy to eighty years; he pointed to two other criminals involved in the same crime and told Morris because they cooperated they were only sentenced to five to ten years. Agent Pritchett does not deny there are pictures of the "top 12" "biggest baddest robbers" on the walls of the Violent Crimes Task Force office and that they

occasionally—allegedly three times in three years—use them to illustrate the lesser sentence a defendant may receive if he cooperates. (IV R. at 93–94.) At the hearing, Pritchett testified he could not remember if he used the pictures with Morris.

In this appeal, Morris also asserts he was not read his Miranda warnings until after he agreed to make a statement. He further claims that he was told his statement would not be accepted if he requested that an attorney be present and that he requested an attorney both at the 12:30 a.m. and 3:00 a.m. meetings. Finally, he asserts he made the incriminating statement because "he was led to believe the difference in cooperating or not was ten years versus 80 years." (Appellant's Br. at 26.)

A suspect may waive his Fifth Amendment right against self-incrimination only if two elements are met.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

United States v. Hernandez, 913 F.2d 1506, 1509 (10th Cir. 1990) (quotation omitted). Factors that should be considered in assessing whether a statement was voluntarily made include:

(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment.

Glover, 104 F.3d at 1579.

The trial court examined the above factors in concluding that Morris's confession was voluntary. The court found that Morris was given a proper Miranda warning, which he understood, and that he was not threatened with force or violence. Given Morris's age (nineteen), education (through tenth grade), and prior experience with the law (five previous arrests), the court found "apparent" that Morris was "possessed of sufficient intelligence, maturity and sophistication to understand the circumstances in which he found himself." (I R. Doc. 84 at 11.) The court explicitly disbelieved Morris's assertion that he asked for an attorney. Although the court found the "officers' testimony regarding the circumstances under which [Morris's] statement was taken to be more credible than Morris' version," the court did not entirely discredit Morris's testimony. (Id. at 12.) For example, despite Pritchett's testimony that he could not remember if he discussed the photos with Morris, the court found Morris was shown the photos and was told about the disparate sentences criminals who had cooperated received compared to those criminals who had not cooperated. Importantly, however, the court concluded the information "was presented in the form of fact rather than

- 21 -

threat" and that Morris was not "promised leniency to induce his statement." ( Id. at 11–12.)

There is nothing to suggest the relevant facts the district court found were clearly erroneous. [6] The standard of review does not permit us, based on a reading of the cold record, to substitute our judgment for the district court's concerning whether the statements made by Pritchett to Morris about the possibility of receiving a lenient sentence were made in a threatening manner or served to intimidate Morris. See Chalan, 812 F.2d at 1307–08. Affording appropriate deference to the trial court's findings of fact, we hold that the district court's legal conclusion concerning the voluntariness of Morris's confession was proper. Accordingly, we affirm the denial of the motion to suppress.

### III

For the reasons stated above, we **REMAND** to the district court with orders to **VACATE** the judgments of conviction and corresponding sentences entered thereon for the five § 924(c) counts and for entry of judgment and sentencing on

---

[6] We emphasize that those findings of fact relevant to our conclusion regarding the voluntariness of Morris's confession were not clearly erroneous. Assuming, arguendo, the district court improperly found that the car Morris was driving was registered to Toles and that the NCIC report was obtained before his arrest, we would not on that basis be compelled to change our conclusion regarding the court's other findings of fact and determinations of credibility.

no more than one § 924(c) count per Hobbs Act conviction.  In all other aspects,

we **AFFIRM**  the judgment of the district court.