**F I L E D**

**UNITED STATES COURT OF APPEALS**

**November 29, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KENNETH WATERBURY,

Defendant-Appellant.

No. 05-3104

(D. Kan.)

(D.C. NO. 03-CR-20051-02-JWL)

ORDER AND JUDGMENT[*]

Before **McCONNELL**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

Kenneth Waterbury appeals his jury convictions arising from his participation in a Kansas City, Kansas methamphetamine distribution ring. Waterbury was convicted on three counts: (1) conspiracy to distribute more than 500 grams of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and 846; (2) possession with intent to distribute five or more grams of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 842 (b)(1)(B)(viii); and (3) being a felon in possession of a firearm

---

[*] This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders; nevertheless, an order may be cited under the terms and conditions of 10th Cir. R. 36.3.

in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). On appeal he argues that (1) a gun, drugs, and currency seized at his arrest should have been suppressed under the Fourth Amendment, and (2) in any event, the evidence presented against him at trial was insufficient to support his three convictions.

We disagree for the reasons discussed below and AFFIRM the district court.

## I. Background

On April 11, 2004, Kansas City police executed a search warrant on an apartment located at 1124 Hilltop in west Kansas City, Kansas. The apartment was rented to Carl Rieger, a friend of Carlos Portillo-Quezada, and police suspected it as a "storefront" for methamphetamine distribution. Police believed Portillo-Quezada to be the ring-leader of a large scale methamphetamine distribution ring, and were also investigating him in connection with the recent murder of Bruce Andrews, whose body had been discovered several days before the search.

Police executed the warrant at 5:45 a.m. Even though authorized to conduct a no-knock raid, police officers involved in the warrant's execution identified themselves before forcibly entering the apartment. Officer Christopher McAlister was first into the apartment, he was followed by Officer Chris Johnson. Almost immediately upon entry, McAlister encountered three people in a front living room, including Waterbury and two women. To secure the room,

McAlister ordered all three to lie face-down on the floor. Prior to ordering Waterbury and his companions to lie down, McAlister observed the floor to be clear of objects. After the suspects were on the floor, McAlister observed Waterbury's right hand next to his right leg, and noticed him engaging in furtive movements. After repeatedly ordering Waterbury to bring his hand away from his leg and place it on the floor above his head, McAlister noticed a .380 caliber handgun next to Waterbury's right leg, where his hand had been. When the room was secure, McAlister placed Waterbury under arrest for illegally possessing a concealed weapon.

Waterbury was searched incident to his arrest by Johnson. Johnson found three packages of methamphetamine and $452 in currency on Waterbury. Of the currency seized, $30 was in marked government bills which had been used in a drug transaction between Portillo-Quezada and an undercover Kansas City police officer six hours earlier.

After his arrest, Waterbury was placed in the back seat of Officer Gary Wansley's patrol car. Wansley testified that Waterbury was the only passenger he transported that morning and that he placed Waterbury into the patrol car just after completing an interior and exterior check of the vehicle. Wansley later discovered seven rounds of .380 caliber ammunition in the crevice of the seat where Waterbury had been seated. Wansley further testified that no one other

than himself and Waterbury had access to the rear seat of his patrol car from the time he inspected it until his discovery of the bullets.

Prior to trial, Waterbury moved to suppress the gun, methamphetamine and currency. The district court denied the motion, finding that McAlister had probable cause to arrest Waterbury for carrying a concealed weapon, and that the search was valid incident to the arrest.

Waterbury was tried alongside two co-defendants: Portillo-Quezada and Noe Espino. At trial, the government presented testimony by several witnesses, including Rieger, whom prosecutors contended was Portillo-Quezada's right-hand-man in the distribution ring. Rieger testified that he would often deliver methamphetamine for Portillo-Quezada, and that Waterbury would sometimes deliver the drugs when Rieger was unavailable. Rieger claimed that Waterbury was present for many drug transactions at the 1124 Hilltop apartment and helped customers of Portillo-Quezada "sample" methamphetamine by smoking it with them and possibly by "loading up" pipes for them. Vol. IV at 51-54. Finally, Rieger testified that he had seen Waterbury "showing off" a .380 caliber handgun just before the police raid. Id. at 66. The gun, three packets of methamphetamine, and the marked currency were all introduced against Waterbury at trial.

## II. Analysis

## A. Probable Cause to Arrest

Waterbury first argues that the district court erred when it refused to suppress the gun, methamphetamine, and marked currency found when he was searched incident to his arrest. Specifically, Waterbury maintains that McAlister did not have probable cause to arrest him for unlawful possession of a concealed firearm for two unrelated reasons: (1) McAlister could not be certain the .380 caliber handgun belonged to Waterbury, and (2) even if the gun was linked to Waterbury, McAlister could not know at the time of arrest whether he had a lawful reason to possess a concealed weapon under Kansas law.

We review de novo whether an arrest is in violation of the Fourth Amendment. *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999). In conducting this review, we accept the district court's findings of fact unless clearly erroneous. *Id.*

An officer has probable cause to arrest if, under the totality of the circumstances, he "learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001) (internal quotations omitted). The rules governing probable cause "'are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians'" must act. *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Probable cause is

itself a "fluid concept" and the process of determining its existence does not deal with hard certainties, but with "probabilities." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *accord Gates*, 462 U.S. at 231. That said, probable cause requires something "more than mere suspicion." *Morris*, 247 F.3d at 1088.

In denying Waterbury's motion to suppress, the district court found that McAlister and Johnson had testified "extremely credibly" at the suppression hearing regarding their encounter with Waterbury. App. Ap. at 82–83. The court found that upon entering the apartment, the officers saw the living room floor clear of weapons before ordering Waterbury and his two female companions to the ground. Only after ordering Waterbury to move his hands away from his right side did the police discover the gun. The district court concluded:

> [A]t that juncture [the officers] certainly had probable cause to arrest Mr. Waterbury for having a concealed weapon, whether if that case ever went to trial the government would sustain its burden of proof beyond a reasonable doubt or not, who knows? But certainly [they] had probable cause to believe that a weapon which had not been there previously, had not been in Mr. Waterbury's hands or on the floor and suddenly appeared on the floor next to him, had been concealed by Mr. Waterbury.

Id.

Based on the objective facts, the police had probable cause to arrest Waterbury. Waterbury first claims that McAlister could not have been certain the gun had been concealed by Waterbury, pointing to alleged inconsistencies in McAlister's testimony. In particular, Waterbury cites to McAlister's admission

that he was not completely sure where the gun came from because he never saw Waterbury remove the gun from his pocket. However, McAlister's testimony is consistent with the district court's factual finding that both McAlister and Johnson saw the empty floor near Waterbury prior to Waterbury's furtive movements and then saw a handgun at his right side. A reasonable police officer could conclude that the gun was Waterbury's and that he had removed it from his clothing just prior to the officer discovering it. We cannot say the district court's evaluation of this testimony was clearly erroneous.

Waterbury also claims on appeal that the district court erred in concluding he violated Kansas's concealed weapons statute. Kansas law prohibits carrying a concealed weapon anywhere other than on one's own property without a permit. K.S.A. 21-4201(a)(4). Waterbury claims the officers who raided the apartment could not be certain that Waterbury was not the owner or lessee of the apartment, and therefore entitled to conceal a weapon. This argument was not raised before the district court and we need not address it. *United States v. Moore*, 22 F.3d 241, 243 n.3 (10th Cir. 1994). It is, however, easily disposed.

The police knew the apartment was rented by Rieger and used by Portillo-Quezada. The officers conducting the raid would have been able to identify Portillo-Quezada and Rieger, and certainly to know them from Waterbury. Even if McAlister himself did not know Waterbury by sight at the time of the raid, the officers conducting the search had sufficient facts to know that Rieger, and not

Waterbury, rented the apartment. Collectively, the officers conducting the search thus knew that Waterbury was not entitled to carry a concealed weapon on the premises. Our cases attribute this collective knowledge to the arresting officer in making a determination whether probable cause existed to support the arrest. *United States v. Goeltz*, 513 F.2d 193, 197 (10th Cir. 1975); *see also United States v. Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982) (applying *Goeltz* principle to determination of reasonable suspicion in *Terry*-stop context); *United States v. Miramonted*, 365 F.3d 902, 905 (10th Cir. 2004) (applying rule of *Merritt* to warrantless arrest).[1]

Accordingly, the district court properly denied Waterbury's motion to suppress the evidence seized as a result of the search.

## B. Sufficiency of the Evidence

Waterbury's second argument is that even if the items from the search were admissible, the evidence at trial was still insufficient to support the three convictions. We review the sufficiency of evidence de novo, *United States v. Wiseman*, 172 F.3d 1196, 1212 (10th Cir. 1999), and will uphold a conviction if, on the basis of the evidence presented together with reasonable inferences drawn from it, a rational juror could have found the essential elements of the charged

---

[1] We also agree with the district court that, even if the police lacked probable cause to arrest Waterbury upon discovery of the gun, they had sufficient reason to conduct a pat down search of Waterbury and thereby would have inevitably discovered the drugs and money. *United States v. Mikulski*, 317 F.3d 1228, 1234–35 (10th Cir. 2003).

crime beyond a reasonable doubt. *United States v. Nguyen*, 413 F.3d 1170, 1176 (10th Cir. 2005). In conducting this review, we consider the evidence in the light most favorable to the jury's verdict. *Id.*

### 1. Conspiracy to Possess and Distribute Methamphetamine

In order to gain a conviction under 21 U.S.C. § 846, the government must prove four elements: (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement in the conspiracy, and (4) interdependence among the alleged participants in the conspiracy. *United States v. Delgado-Uribe*, 363 F.3d 1077, 1083 (10th Cir. 2004). "[K]nowledge [of illegal activity] and presence [at the crime scene] coupled with knowing participation in the illegal drug activities are sufficient to sustain a drug conspiracy [conviction]." *United States v. Coyote*, 963 F.2d 1328, 1331 (10th Cir. 1992); *Nguyen*, 413 F.3d at 1177.

Waterbury maintains that the government failed to present evidence proving his knowing and voluntary involvement in the drug conspiracy. He contends the government showed that although he was an acquaintance of Portillo-Quezada, he would only occasionally fix Portillo-Quezada's vehicles, or "hang out" at the 1124 Hilltop apartment. App. Br. at 16-17. This evidence, he claims, is legally insufficient to support an inference that he was an active member of the conspiracy.

This argument is at odds with the record. At trial, the government presented extensive evidence that Waterbury knowingly and voluntarily participated in the conspiracy. Patrick Loffredo, a frequent purchaser of drugs from the ring, testified that he saw Waterbury at the apartment while buying drugs and had seen Waterbury help customers sample methamphetamine for sale by packing their pipes and smoking with them. Rieger was an active participant in the conspiracy. He testified that Waterbury would deliver methamphetamine when Rieger was unavailable. In addition, according to Rieger, members of the drug conspiracy used Waterbury's residence for methamphetamine sales with Waterbury's consent. Finally, a jailhouse letter written by Waterbury and sent to a friend disclosed that he lost over $9000 the night of the raid, and supported an inference he was active in what he described as "the game," namely the drug conspiracy. Supp. Vol. IV at 58.

Viewed in the light most favorable to the jury's guilty verdict, the evidence was more than sufficient to allow a rational juror to convict Waterbury of conspiracy.

### 2. Possession with Intent to Distribute Methamphetamine

Possession with the intent to distribute is demonstrated by evidence that the defendant knowingly possessed a controlled substance and intended to sell it. *United States v. Jenkins*, 175 F.3d 1208, 1215–16 (10th Cir. 1999). Intent to distribute can be inferred from a number of factors accompanying possession,

including (1) the quantity, purity, and value of the drugs possessed; (2) the manner in which the drugs are packaged; (3) the presence of firearms (as common tools of the trade); and (4) the presence of large sums of money. *United States v. Allen*, 235 F.3d 482, 492 (10th Cir. 2000); *United States v. Wilson*, 107 F.3d 774, 779 (10th Cir. 1997); *United States v. Wood*, 57 F.3d 913, 918–19 (10th Cir. 1995).

On appeal, Waterbury asserts:

The evidence in the instant matter establishes only that Mr. Waterbury, when searched[,] had three small quantities of methamphetamine on his person. He did not possess large amount of cash and no weapons were found on him. There was also no packaging material found on Mr. Waterbury.

App. Br. at 18. This claim is contradicted by the record. The methamphetamine discovered on Waterbury totaled 37.27 grams, an amount consistent with distribution quantities. The methamphetamine was high quality and individually packaged in small plastic bags, also consistent with intent to distribute. Waterbury had $452 in cash, including $30 of the pre-marked government funds used in the controlled buy from Portillo-Quezada six hours prior to Waterbury's arrest. Waterbury carried a concealed weapon when confronted by the police at the raid. His jailhouse letter indicated he had lost $9000 as a result of the raid, further bolstering the prosecution's argument that he distributed drugs.

Viewed in the light most favorable to the verdict, a rational jury could conclude that Waterbury intended to sell the drugs found at the raid.

-11-

### 3. Felon In Possession

Finally, ample evidence supports the felon in possession conviction. To prove that a felon illegally possessed a firearm in violation of 18 U.S.C. § 922(g)(1), the government must show either (1) actual, knowing possession of a firearm, or (2) constructive possession of a firearm. *United States v. Lauder*, 409 F.3d 1254, 1259 (10th Cir. 2005). Waterbury argues the evidence does not establish he actually possessed the handgun found near him at the raid, and any evidence showing constructive possession is speculative and inconsistent. We disagree.

The government presented evidence of actual possession through Rieger's testimony that the seized .380 caliber handgun closely resembled a firearm Waterbury was "showing off" at the apartment before the police raid. (Supp. Vol. IV at 64–66.) Further, McAlister's testimony that the gun was found near Waterbury's side after he moved his right hand supports the inference that Waterbury discarded the weapon when he believed he would be searched and could no longer conceal it. These facts, when combined with the seven .380 caliber bullets found in the back seat of the patrol car transporting Waterbury, amply support the inference that Waterbury possessed and directly controlled a .380 caliber handgun at the 1124 Hilltop apartment.

Viewed in the light most favorable to the jury's verdict, the evidence presented supports Waterbury's conviction on a theory of actual possession.

-12-

### III. Conclusion

For the foregoing reasons, we conclude the district court properly admitted evidence found incident to Waterbury's arrest.  We also find that a rational jury could conclude that the evidence submitted at trial was sufficient to support his three convictions.  Accordingly, we AFFIRM.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge